# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SUZANNA and ROGER MATTOX,　　　　　） | |
| 　　　　　） | |
| 　　　　　Plaintiffs,　　） | |
| 　　　　　） | |
| v.　　　　　） | |
| 　　　　　）　Case No. 6:24-cv-235-JAR | |
| PRODUCT INNOVATIONS RESEARCH,　） | |
| LLC d/b/a SUNEVOLUTIONS; COSWAY　） | |
| COMPANY, INC.; and JOHN DOES 1-3,　） | |
| 　　　　　） | |
| 　　　　　Defendants.　） | |

### OPINION AND ORDER

This is a strict products liability and negligence action arising out of an alleged allergic reaction to a cosmetic tanning lotion. Before the Court are two motions, fully briefed: defendants Product Innovations Research, LLC d/b/a Sunevolutions' ("PIR") and Cosway Company, Inc.'s ("Cosway") motion for summary judgment pursuant to Fed. R. Civ. P. 56 [Dkt. 53];[1] and plaintiffs Suzanna Mattox's ("Mrs. Mattox") and Roger Mattox's ("Mr. Mattox") motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 [Dkt. 158 (SEALED)].

### I.   UNDISPUTED MATERIAL FACTS [2]

On May 12, 2022 at approximately 6:00 p.m., Mrs. Mattox presented to the emergency department at Eastern Oklahoma Medical Center in Poteau, Oklahoma with severe respiratory distress. While awaiting a bed, she experienced "respiratory

---

[1] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers provided by CM/ECF.

[2] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

1

and cardiovascular collapse secondary to respiratory distress possibly caused by anaphylaxis" and was airlifted to Baptist Medical Center in Fort Smith, Arkansas. When emergency personnel obtained a history from Mr. Mattox, he reported that (1) Mrs. Mattox had experienced chest and back tightness for "the past few days," (2) she began vomiting and experiencing shortness of breath after he applied chiropractor-prescribed anti-inflammatory cream to her chest and back at approximately 4:30 p.m., and (3) she "has a severe allergy to certain types of nuts and to ibuprofen." [Dkt. 165-7 at 85, 90]. Mrs. Mattox was discharged from Baptist Medical Center on May 21, 2022. [Dkt. 165-2 at 102].

At a follow-up visit to ProCare Family Medical Health on May 24, 2022, Mrs. Mattox told Dr. William Willis that she had used a tanning lotion called "Love Bronze" on May 12, 2022. [Dkt. 53-4 at 3 (66:11-15); Dkt. 165-2 at 102]. Dr. Willis documented that Mrs. Mattox "is allergic to nuts" and noted that "almond oil was in the lotion she used at the tanning salon." [Dkt. 165-2 at 102]. ProCare office manager Evelyn Tustin conducted an internet search of the ingredients listed on the Love Bronze bottle that Mrs. Mattox brought to the appointment and concluded that one ingredient reflected a base of almond oil, although she later could not identify which ingredient that was. [Dkt. 53 at 9, ¶ 11; Dkt. 165 at 6, ¶ 11; Dkt. 53-6 at 8 (17:11-15)].[3] Dr. Willis subsequently testified that he had no opinion, and was not qualified to offer one, as to whether the Love Bronze product contained nuts or beans. [Dkt. 53 at 10, ¶ 19; Dkt. 165 at 7, ¶ 19].

---

[3] Ms. Tustin holds an associate degree in allied health and has no nursing training. [Dkt. 53 at 10, ¶ 17; Dkt. 165 at 7, ¶ 17].

Mrs. Mattox underwent allergy testing in 2012 for idiopathic angioedema, but no nut or bean allergy was formally diagnosed. [Dkt. 53 at 11, ¶ 20; Dkt. 165 at 7, ¶ 20; Dkt. 165-7 at 106]. She was instructed to identify any allergy through "trial and error." [Dkt. 53-4 at 6 (109:4-21)]. Thereafter, she observed swelling of her hands, fingers, and face after consuming nut- and bean-based products and concluded she was allergic to nuts and beans. [*Id.* at 4 (74:2-7)]. Consistent with that belief, plaintiffs did not serve nuts or beans at their family-owned restaurant and prohibited employees from working after consuming or handling nuts or beans. [Dkt. 165-3 at 112 (111:15-21), 116-17 (115:17-116:1)].

Defendant Cosway manufactured three batches of Love Bronze tanning lotion on August 12, 2016, August 29, 2016, and October 2017. Cosway prepared an ingredient list in descending order of predominance for each batch, and defendant PIR used those lists to create the product labels. Love Bronze is a cosmetic lotion without sunscreen or active SPF ingredients. [Dkt. 53 at 7-8, ¶¶ 1-3; Dkt. 165 at 5-6, ¶¶ 1-3]. The product label included the following warning:

> Warning—This product does not contain sunscreen and does not protect against sunburn. Repeated exposure of unprotected skin while tanning may increase the risk of skin aging, skin cancer and other harmful effects to the skin even if you do not burn. Discontinue use if irritation occurs. Avoid Contact with eyes. For external use only.

The label also stated: "Does not Contain Parabens." [Dkt. 53 at 8, ¶ 4; Dkt. 165 at 6, ¶ 4; Dkt. 53-5]. Apart from the claims asserted in this action, neither Cosway nor the Food and Drug Administration (FDA) has received an adverse event report for the Love Bronze product. Plaintiffs note, however, that the FDA cited Cosway in 2017 for

failing to report adverse events related to other cosmetic products. [Dkt. 53 at 11, ¶ 25; Dkt. 165 at 7, ¶ 25].

At the time of manufacture in 2016 and 2017, PIR had no distributors in Oklahoma and did not sell Love Bronze to any Oklahoma entity. [Dkt. 53 at 8, ¶ 6; Dkt. 165 at 6, ¶ 6]. It is undisputed, however, that Mrs. Mattox purchased Love Bronze on May 9, 2022 at a local tanning salon and used the lotion in the days leading up to May 12 without experiencing a severe allergic reaction. [Dkt. 53 at 8, ¶ 5; Dkt. 165 at 6, ¶ 5]. Ms. Tustin photographed the front and back of the Love Bronze bottle presented at the May 24 appointment, but the photographs do not display a batch code. [Dkt. 53 at 9, ¶¶ 7-8; Dkt. 165 at 6, ¶¶ 7-8].

According to plaintiffs, Ms. Tustin refused to return the Love Bronze bottle after the May 12 appointment. [Dkt. 53-4 at 2 (60:1-12); Dkt. 53-8 at 2-3 (17:12-18:16)]. Ms. Tustin testified that she left the bottle on a counter in the billing office, issued no instruction for its retention, and received no request to preserve it. [Dkt. 53 at 9-10, ¶¶ 12-13, 16; Dkt. 165 at 7, ¶¶ 12-13, 16]. In September 2023, when Mr. Mattox inquired about the bottle, Ms. Tustin informed him that another employee had used and discarded it. [Dkt. 53 at 10, ¶¶ 14-15, Dkt. 165 at 7, ¶¶ 14-15].

## II.  PROCEDURAL HISTORY

Plaintiffs initiated this action on April 18, 2024 in the District Court of Leflore County, Oklahoma, asserting the following claims against all defendants: (1) negligence; (2) negligent training; (3) negligent supervision; and (4) strict products liability for defective design, defective manufacturing, failure to warn, and breaches

of duty in labeling and marketing. [Dkt. 2-2, ¶¶ 50-70]. Plaintiffs seek actual, compensatory, and punitive damages. [*Id.* ¶¶ 71-89]. Defendants timely answered and asserted affirmative defenses including, *inter alia*, assumption of risk and intervening cause. [Dkt. 15 at 9-12]. On July 10, 2024, defendants removed the case based on diversity jurisdiction. [Dkt. 2]. By virtue of the express consent of the parties [Dkt. 20], and in accordance with Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and the entry of a final judgment.

Plaintiffs initially responded to defendants' motion for summary judgment on June 20, 2025. [Dkt. 61 (SEALED)]. The following week, plaintiffs moved for partial summary judgment. [Dkt. 72]. Defendants filed a reply in support of summary judgment on July 29, 2025, noting that they were unable to locate multiple cases cited in plaintiffs' sealed response. [Dkt. 104 at 8]. On August 4, 2025, plaintiffs' counsel moved to amend the sealed response and several motions in limine, stating the amendments were necessary to correct "clerical and formatting errors." [Dkt. 107].

Upon *sua sponte* review of all filings submitted on behalf of plaintiffs, the Court identified eleven pleadings containing fourteen nonexistent cases and fourteen erroneous or misquoted authorities. *See* [Dkt. 148 at 4-8]. All eleven pleadings were signed by attorney Harrison Howle. [*Id.* at 8]. At a show-cause hearing held on September 11, 2025, Mr. Howle admitted that he used an artificial intelligence program, ChatGPT, "to make his writing more persuasive," that the program "changed his citations," and that he did not verify the citations before filing. [*Id.*]. The

Court imposed sanctions that included: monetary fines for each attorney of record for plaintiffs, striking all eleven pleadings containing fabricated or inaccurate citations, and awarding defendants their attorney's fees and costs incurred in responding to those pleadings. [*Id.* at 16-21].

On December 12, 2025, plaintiffs renewed their motion for sanctions against defendants based on alleged discovery violations and bad-faith misconduct. [Dkt. 155]. The Court denied the motion. [Dkt. 156]. Plaintiffs thereafter refiled their motion for partial summary judgment on defendants' affirmative defenses of assumption of risk and intervening cause [Dkt. 158], as well as their sealed response in opposition to defendants' motion for summary judgment [Dkt. 165].

### III.    SUMMARY JUDGMENT STANDARD [4]

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. At the summary judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (*quoting Anderson*, 477 U.S. at 249). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Id*.

---

[4] Oklahoma law governs this diversity action. *See Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1145 (10th Cir. 2003).

(quoting _Adickes v. S.H. Kress & Co.,_ 398 U.S. 144, 157 (1970)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." _Matsushita Elec. Insu. Co., Ltd. v Zenith Radio Corp.,_ 475 U.S. 574, 587 (1986) (citation omitted). When, as here, the parties file cross-motions for summary judgment, the Court considers each motion separately and applies the same standard to each. _See Fox v. Transam Leasing, Inc.,_ 839 F.3d 1209, 1213 (10th Cir. 2016).

## IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on four grounds: (1) plaintiffs' failure-to-warn and labeling claims are preempted by federal cosmetics labeling statutes; (2) plaintiffs' claims fail because they did not retain the product at issue; (3) plaintiffs cannot establish a products liability claim without identifying a defect; and (4) plaintiffs' punitive-damages claims fail absent a product, a duty, and a defect.

### A.   OVERVIEW OF PLAINTIFFS' CLAIMS

The operative complaint asserts four product-based causes of action under Oklahoma law, with federal cosmetic-labeling regulations cited as part of the alleged standard of care. Specifically, plaintiffs allege:

- **Count I – Ordinary Negligence**: defendants owed plaintiffs (i) a duty under 21 C.F.R. § 701.3 to provide lawfully and accurately labeled products for transdermal use; (ii) a duty to maintain policies and procedures ensuring only qualified, supervised, and trained employees produced, handled, and lawfully labeled cosmetic products; and (iii) a heightened duty to ensure the use of proper ingredients, minimizing handling mistakes, and implement adequate training regarding shipping, unpacking, and the prevention of cross-contamination involving tree-nut ingredients. [Dkt. 2-2, ¶¶ 50-56].

- **Count II – Negligent Training**: defendants failed to maintain adequate policies and procedures to ensure employees were properly trained

in safe tree-nut manufacturing practices. [*Id.* ¶¶ 57-61].

- **Count III – Negligent Supervision**: defendants failed to maintain adequate policies and procedures to ensure proper supervision of employees handling tree-nut ingredients. [*Id.* ¶¶ 62-67].

- **Count IV – Strict Products Liability**: defendants "unlawfully placed mislabeled tanning lotion" into the stream of commerce with knowledge that consumers would be unable to inspect the product for "harmful ingredients." [*Id.* ¶¶ 68-70].

Plaintiffs' allegations in Count I substantially overlap with the theories advanced in the remaining counts. The labeling allegations mirror the warning-and-labeling theory asserted under Count IV, and the training, supervision, and cross-contamination allegations substantially duplicate the negligent-training and negligent-supervision theories in Counts II and III. Thus, all four counts assert products-based theories arising under Oklahoma law and are tied to the same core allegation: that defendants placed into the stream of commerce a tanning lotion containing allergenic ingredients that was defectively designed, manufactured, or labeled. In the sections that follow, the Court sets out the governing strict liability and negligence standards and then uses those frameworks to evaluate the duties plaintiffs assert under these product-based theories.

### 1. Strict Products Liability

The Oklahoma Supreme Court set forth three factors that a plaintiff must prove in order to establish a viable products liability claim:

> *First* ... Plaintiff must prove that the product was the cause of the injury; the mere possibility that it might have caused the injury is not enough.
>
> *Secondly*, Plaintiff must prove that the defect existed in the product, if the action is against the manufacturer, at the time the product left the manufacturer's possession and control. If the action is against the

8

> retailer or supplier of the article, then the Plaintiff must prove that the article was defective at the time of sale for public use or consumption or at the time it left the retailer's possession and control.
>
> *Thirdly*, Plaintiff must prove that the defect made the article unreasonably dangerous to him or to his property.

*Kirkland v. Gen Motors Corp.*, 1974 OK 52, 521 P.2d 1353, 1363 (internal citation omitted). "The defect can stem from either a dangerous design or an inadequate warning about the product's dangers." *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1085 (10th Cir. 2013) (applying Oklahoma law); *see Cunningham v. Charles Pfizer & Co.*, 1974 OK 146, 532 P.2d 1377, 1380-83. To qualify as "unreasonably dangerous," the product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Kirkland*, 521 P.2d at 1362-63 (*quoting* Restatement (Second) of Torts § 402A).

"The distinction to be made regarding who constitutes an ordinary consumer of a specific product is of import consequence." *Woods v. Fruehauf Trailer Corp.*, 1988 OK 105, 765 P.2d 770, 774. "Only where a defect in the product renders it less safe than expected by the ordinary consumer will the manufacturer be held responsible." *Id*. (citation omitted). Here, the ordinary consumer of Love Bronze would be one "familiar with the hazards associated with" the product. *See id*.; *McClain v. Brainerd Chem. Co., Inc.*, 2019 OK CIV APP 15, 436 P.2d 752, 757.

### 2.    Product-Based Negligence

To prevail under a product-based negligence theory, plaintiffs must show that defendants owed them a legal duty, defendants breached that duty, and such breach

was the direct and proximate result of plaintiffs' injuries. *Lockhart v. Loosen*, 1997 OK 103, 943 P.2d 1074, 1079. The threshold question for a negligence claim is whether the defendant owed a duty to the plaintiff. *Wofford v. E. State Hosp.*, 1990 OK 77, 795 P.2d 516, 518. Under Oklahoma law, a manufacturer must exercise ordinary care in the design and manufacture of a product to protect foreseeable users of its products from foreseeable risks of harm. *See Prince v. B.F. Ascher Co., Inc.*, 2004 OK CIV APP 39, 90 P.3d 1020, 1027; *Nicholson v. Tacker*, 1973 OK 75, 512 P.2d 156, 158 ("[j]ust because the defendant has created a risk which harmed the plaintiff … does not mean that, in the absence of some duty to the plaintiff, the defendant will be held liable").

Plaintiffs contend that manufacturers and distributors owe "product users" a duty of reasonable care that encompasses duties "to avoid foreseeable harm" caused by mislabeling, failure to warn, failure to test, failure to adhere to industry standards, failure to comply with federal regulations, and negligent formulation. *See* [Dkt. 165 at 13, 14, 21, 22]. They allege defendants breached these duties by manufacturing and distributing a tanning product containing ingredients derived from tree nuts and legumes, failing to test the product or its components for allergenic potential, failing to conduct Repeat Insult Patch Testing (RIPT) or Human Repeat Insult Patch Testing (HRIPT), and failing to warn consumers of those risks. [*Id.* at 13]. Plaintiffs rely on the following five authorities to support the scope of these alleged duties.

*Swift v. Serv. Chem., Inc.*, 2013 OK CIV APP 88, 310 P.3d 1127 holds that, in the products context, a manufacturer has a duty "to use reasonable care to provide

adequate warnings or instructions to avoid injury to a foreseeable plaintiff," thereby framing the pertinent negligence duty as one of reasonable care in providing warnings or instructions. *Id*. at 1133. *Swift* does not, as plaintiffs suggest, recognize a generalized duty "to avoid foreseeable harm caused by mislabeling, failure to warn, failure to test, and negligent formulation." [*Id*. at 13]. Alleged deficiencies in labeling, testing, or formulation are factual theories by which a plaintiff may attempt to show breach of that warnings-and-instructions duty; they are not independent duties created by *Swift*. *See id*. at 1133-34.

*Tansey v. Dacomend Corp.*, 1994 OK 146, 890 P.2d 881 reaffirmed in the manufacturers' products liability context that, under Restatement § 402A and *Kirkland*, a seller is strictly liable when it places a product "in a defective condition which makes it unreasonably dangerous" and that product causes physical harm to the user, and addressed Comment k to § 402A as a defense for certain prescription medical devices. *Id*. at 884-86. *Tansey* presupposes existing strict-liability duties regarding design and warnings. It does not recognize, as plaintiffs contend, a separate negligence duty "to avoid misleading consumers." [*Id*. at 14].

In *Howard v. Zimmer, Inc.*, 2013 OK 17, 299 P.3d 463, the Oklahoma Supreme Court held that Oklahoma law allows a parallel negligence *per se* claim based on violation of a federal regulation where that regulation supplies the duty and standard of care. *Id*. at 467. *Howard* requires identification of a particular federal regulation that applies to the defendants' conduct, protects a class including the plaintiff, and is intended to prevent the type of harm alleged; it does not hold, as plaintiffs here assert,

11

that any and all violations of the Federal Food, Drug, and Cosmetic Act (FDCA) are "highly probative" of breach or reckless disregard. [*Id*. at 21].[5] *See id*. at 467, 471-73.

O'Banion v. Owens-Corning Fiberglas Corp., 968 F.2d 1011 (10th Cir. 1992), applying Oklahoma law, treated "state of the art" and industry-standard evidence as relevant but non-dispositive on negligence and products liability claims, and recognized a continuing duty to warn when a manufacturer becomes aware of a defect. *Id*. at 1016. Properly read, *O'Banion* treats prevailing industry standards as non-dispositive evidence bearing on breach of duties otherwise established under Oklahoma law. It does not hold that "failure to adhere to prevailing industry standards is probative of breach of duty" in the broad sense urged by plaintiffs. [*Id*.].

Likewise, *Smith v. Minster Mach. Co.*, 669 F.2d 628 (10th Cir. 1982), interpreting *Kirkland*, held that a manufacturer is not excused from strict liability merely because other manufacturers produce similar products, and that "state of the art" evidence may be considered but does not alter the § 402A duty not to market a product in a defective, unreasonably dangerous condition. *Id*. at 633-34. *Smith* does not hold, as plaintiffs contend, that a manufacturer's alleged disregard of "safety protocols" automatically gives rise to negligence liability or punitive culpability. [*Id*. at 21-22]. Rather, it limits the defensive use of industry-custom evidence within Oklahoma's strict-liability framework.

---

[5] Plaintiffs appear to invoke *Howard* to support the contention that federal regulatory violations can be used as a basis for negligence *per se*. [*Id*. at 21-22]. However, plaintiffs have not asserted a negligence *per se* claim in this action. In the absence of a pleaded negligence *per se* theory that satisfies *Howard*'s requirements, plaintiffs' references to federal regulations are properly treated, at most, as evidence bearing on ordinary negligence, not as an independent cause of action.

Alternatively, plaintiffs argue that negligence may be inferred under *res ipsa loquitur* because a catastrophic allergic reaction ordinarily does not occur in the absence of negligence. [*Id.* at 22-23]. Under Oklahoma law, *res ipsa loquitur* is an evidentiary doctrine that, in limited circumstances, permits an inference of negligence when (1) the event is a kind that ordinarily does not occur in the absence of negligence, (2) the instrumentality was within the exclusive control of the defendant, and (3) the injury was not due to any voluntary act or contribution on the part of the plaintiff. <u>Mitchell v. Cox</u>, 1997 OK 139, 948 P.2d 317, 319 (*citing* <u>Qualls v. U.S. Elevator Corp.</u>, 1993 OK 135, 863 P.2d 457, 460). *Res ipsa loquitur* does not create a new duty, does not supply a product defect, and does not apply where the injury may reasonably occur in the absence of negligence. *See* <u>id</u>. at 319-20; <u>Qualls</u>, 863 P.2d at 460-61; <u>Kirkland</u>, 521 P.2d at 1363. It therefore does not relieve plaintiffs of their obligation to identify a specific defect or breach of a recognized duty and does not independently defeat summary judgment.

### 3.    Disposition as to Duties Owed by Defendants

Oklahoma law recognizes distinct duties in strict liability and negligence. Under manufacturers' products liability, a seller engaged in the business of selling a product has a duty not to place into the stream of commerce a product that is in defective condition and unreasonably dangerous to the user or consumer, provided the product is expected to and does reach the user without substantial change in condition. *See* <u>Kirkland</u>, 521 P.2d at 1363, 1366. A warning defect may satisfy that standard only if the lack of an adequate warning renders the product more dangerous

than would be contemplated by the ordinary consumer. *See* *Cunningham*, 532 P.2d at 1380; *Swift*, 310 P.3d at 1131.

By contrast, Oklahoma negligence law imposes duties of reasonable care only in those specific respects recognized by law. *See* *Prince*, 90 P.3d at 1027. Read together, *Swift*, *Tansey*, *Howard*, *O'Banion*, and *Smith* confirm that, in the products setting, those duties principally concern warnings or instructions and, in limited circumstances, duties defined by a specified statutory or regulatory standard through negligence *per se*. They do not establish the broader, free-floating duty "to avoid foreseeable harm" in any manner plaintiffs propose. Nor does *res ipsa loquitur* enlarge those duties; it is an evidentiary doctrine and does not relieve plaintiffs of the obligation to identify a cognizable theory of defect and breach.

## B.  PREEMPTION

Defendants contend that plaintiffs' failure-to-warn and labeling theories under Counts I and IV are expressly preempted by the FDCA, 21 U.S.C. § 379s, and its implementing cosmetic-labeling regulations, 21 C.F.R. §§ 701.3, 740.19 [Dkt. 53 at 13-16]. Section 379s provides in pertinent part:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement for labeling or packaging of a cosmetic that is different from or in addition to, or that is otherwise not identical with, a requirement specifically applicable to a particular cosmetic or class of cosmetics under this chapter …

In evaluating express preemption, federal courts ask whether Congress has imposed requirements applicable to the product at issue and, if so, whether the challenged state-law claims would impose labeling or packing requirements that differ from, or

14

add to, those federal obligations. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321-22 (2008); *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1278 (10th Cir. 2021).

It is undisputed that Love Bronze is a "suntanning preparation that does not contain a sunscreen ingredient" and is therefore subject to specific FDA cosmetic-labeling regulations. First, the label on each bottle must "bear a declaration of the name of each ingredient in descending order of predominance," subject to limited exceptions for fragrance and flavor and for ingredients exempted from public disclosure. 21 C.F.R. § 701.3(a). Second, the labeling on Love Bronze bottles "must display" a particular warning concerning the absence of sun protection and the risks of repeated UV exposure. 21 C.F.R. § 740.19. Plaintiffs do not contend that defendants omitted the mandated suntanning warning or that the Love Bronze label fails to list all of its ingredients in descending order of predominance.

Instead, plaintiffs argue that defendants were obligated to go further. They contend defendants should have identified certain ingredients by more familiar common names, disclosed that one or more ingredients were derived from nuts or legumes, added "may contain" allergen language, and warned of photosensitization risks associated with ingredients such as DHA and glycolic acid. [Dkt. 165 at 14]. None of these additional warnings or disclosures is required by §§ 701.3(a) or 740.19. Thus, plaintiffs' generalized allegation that defendants failed to "identify ingredients lawfully and accurately … according to 21 C.F.R. § 701.3" does not state a viable parallel claim grounded in noncompliance with federal law. [Dkt. 2-2, ¶ 53].

Plaintiffs cite three Supreme Court cases to argue that their failure-to-warn

and labeling theories fall within non-preempted state-law duties to warn. [Dkt. 165 at 14]. Those decisions, however, distinguish between state-law claims that simply track federal requirements and those that seek to impose additional or different labeling obligations. *See* *Bates v. Dow Agrosciences LLC*, 544 U.S. 432, 440-47 (2005); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518-31 (1992); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 497-502 (1996). Read in context, these cases do not support state-law claims that require manufacturers to add labeling content beyond what federal law mandates, nor do they authorize state-law duties to warn that conflict with or exceed the federal cosmetic-labeling scheme. Plaintiffs also invoke *Tansey* to suggest Oklahoma has recognized a broad duty "to avoid misleading consumers." [*Id.* at 14-15]. *Tansey* reaffirmed existing strict-liability duties under Restatement § 402A and addressed Comment k as a defense; it did not create a separate negligence-based duty to provide warnings beyond those required by governing law. *See* 890 P.2d at 884-86.

Plaintiffs further rely on expert opinion and FDA-related guidance to argue that allergic reactions to cosmetic ingredients are a recognized public-health concern and that reputable manufacturers should conduct allergen and sensitization testing (including RIPT) and adopt enhanced warnings to protect allergic consumers. [*Id.* at 14].[6] That evidence may bear on plaintiffs' negligence and punitive-damages theories insofar as it addresses defendants' safety-assessment practices and alleged deviation

---

[6] Plaintiffs' response cites their expert disclosures—Dkt. 46—without providing page numbers or pinpoint citations. *See* [Dkt. 165 at 6, 9, 10, 11, 17, 23]. The exhibits attached to Dkt. 46 are not accessible through CM/ECF. The thumb drive provided by plaintiffs contains the expert disclosure notice filed at Dkt. 46 and five attached expert reports: Exhibit A (R. Courtland Imel), Exhibit B (Allan Tran, D.O.), Exhibit C (Dariush Orandi, M.D.), Exhibit D (Dale Halfaker, Ph.D.), and Exhibit E (Ralph Scott, Ph.D.). Accordingly, when the Court cites to Dkt. 46, it refers to the natural pagination reflected in the versions of these materials on the thumb drive.

from industry standards. It does not, however, identify any federal cosmetic-labeling regulation that requires allergen-specific disclosures, "may contain" allergen statements, or photosensitizer warnings on cosmetic tanning products.

In sum, plaintiffs' failure-to-warn and labeling theories either seek to require label content that exceeds the cosmetic-labeling obligations imposed by federal regulations or rest on a purported violation of 21 C.F.R. § 701.3 that finds no support in the undisputed record. Express preemption under 21 U.S.C. § 379s(a) bars the former category of claims, and the latter fails on the merits. Plaintiffs' failure-to-warn and labeling theories under Counts I and IV therefore cannot proceed to trial.

### C. PRODUCT IDENTIFICATION AND SPOLIATION

Defendants next argue that the remaining products-based theories fail because plaintiffs did not retain the specific bottle of Love Bronze allegedly used by Mrs. Mattox, the photographs of the product do not show a batch code, and PIR had no distributors in Oklahoma when Cosway manufactured Love Bronze in 2016 and 2017. [Dkt. 53 at 16-18]. Defendants contend that, without the physical product and batch code, plaintiffs cannot establish that Mrs. Mattox used a product manufactured and distributed by defendants or that any defect existed when the product left defendants' control. They further invoke spoliation principles and ask the Court to treat the absence of the bottle as dispositive of plaintiffs' ability to prove defect and causation.

Oklahoma manufacturers' products liability law does not require that the product be preserved or introduced at trial. In _Kirkland_, the Oklahoma Supreme Court held that a plaintiff "may prove his cause of action in Manufacturers' Products Liability by circumstantial evidence and proper inferences drawn therefrom, since

17

this information in the final analysis is usually within the peculiar possession of the defendant," and rejected both the sufficiency of "the mere happening of an accident" and any requirement of "actual or absolute proof of the defect." 521 P.2d at 1355, 1363. The court has likewise declined to adopt rules treating the absence of the product as dispositive of the plaintiff's ability to prove defect or negligence. *See Northrip v. Montgomery Ward & Co.,* 1974 OK 142, 529 P.2d 489, 497 (recognizing that negligence or defect may be proven by circumstantial evidence, expert opinion, or other evidentiary means).

Spoliation doctrine does not alter that analysis on this record. Oklahoma decisions addressing spoliation and adverse inferences emphasize that sanctions are appropriate only where the nonproducing party had a duty to preserve the evidence and acted with culpable intent. *See, e.g., Barnett v. Simmons*, 2008 OK 100, 197 P.3d 12, 21; *Akins v. Ben Milam Heat, Air & Elec., Inc.*, 2019 OK CIV APP 52, 451 P.3d 166, 176-81. Federal courts applying similar principles have generally required a showing of bad faith or intentional destruction in anticipation of litigation before imposing severe sanctions. *See, e.g.*, *United States v. Koch Indus., Inc.*, 197 F.R.D. 463, 482 (N.D. Okla. 1998); *Turner v. Public Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009).

Here, the summary judgment record reflects that Mrs. Mattox purchased a product labeled "Love Bronze" from a tanning salon, brought the bottle with her to a medical appointment shortly after her hospitalization, and that ProCare staff photographed the front and back of that bottle. Mrs. Mattox, Mr. Mattox, and Ms.

18

Tustin each testified that the product used was Love Bronze,[7] and three photographs depict Cosway's commercial packaging for Love Bronze. *Compare* [Dkt. 53-3] *with* [Dkt. 53-5]. It is undisputed that Cosway manufactured three batches of Love Bronze and that PIR used Cosway's ingredient list to create the product label. The record further reflects that Ms. Tustin, a nonparty clinic employee, left the bottle in a billing office and that another staff member ultimately used and discarded it well before plaintiffs initiated litigation.

Defendants' contention—that the lack of a batch code in the photographs, combined with PIR's absence of Oklahoma distributors in 2016 and 2017, precludes plaintiffs from proving that the product used by Mrs. Mattox was manufactured and distributed by defendants—goes to the weight of plaintiffs' circumstantial evidence rather than its admissibility. Viewing the record in the light most favorable to plaintiffs, the Court concludes a reasonable jury could find that the product used was Cosway's Love Bronze within PIR's distribution chain based on the product name, label, branding, ingredient panel, and testimony from three witnesses who personally observed and used the product. The absence of a batch code may be considered by the trier of fact in assessing plaintiffs' proof, but it does not as a matter of law foreclose product identification.

Nor does the nonretention of the bottle support spoliation sanctions or an adverse presumption. Defendants have not identified evidence that plaintiffs, as opposed to a nonparty clinic employee, discarded the product or that plaintiffs knew

---

[7] *See* [Dkt. 165-2 at 11-12 (9:22-10:6), 14 (12:20-25); Dkt. 165-3 at 52 (51:1-3), 60 (59:16-23); Dkt. 165-7 at 61-62 (60:18-61:13)].

or should have known at the time of disposal that litigation was imminent. Absent a showing of a duty to preserve and culpable conduct, the Court will not impose spoliation sanctions. Defendants' motion for summary judgment based on product nonretention and spoliation is therefore denied.

### D.   PRODUCT DEFECT AND CAUSATION

Defendants further argue that plaintiffs cannot establish a cognizable product defect or causation, relying on "rare allergic reaction" authority from other jurisdictions to assert that a hypersensitive reaction, standing alone, is insufficient to support product-based theories. [Dkt. 53 at 18-20]. Plaintiffs respond that Love Bronze was defectively designed and formulated because it contained ingredients derived from nuts and legumes that pose known risks to sensitized individuals, was marketed for use on bare skin in UV tanning environments despite allegedly increasing photosensitivity,[8] and was sold without allergen testing or industry-standard RIPT, HRIPT, or Cosmetic Ingredient Review (CIR). [Dkt. 165 at 17-19].

Plaintiffs first rely on expert allergist testimony identifying three Love Bronze ingredients—dimethicone, parfum, and hydrolyzed vegetable protein—that "may have contained almond/almond oil" and opining, to a reasonable degree of medical certainty, that the eliciting dose causing Mrs. Mattox's anaphylactic reaction "likely" originated from Love Bronze. [Dkt. 46 at 1249]. Yet Dr. Orandi also reported that, although Mrs. Mattox tested positive to almond on a tree nut skin-test panel, she tested negative when skin-tested with Love Bronze lotion. [*Id.* at 1248]. This testing

---

[8] To the extent plaintiffs' defect theories depend on alleged deficiencies in warnings or labeling, those arguments are foreclosed by the Court's ruling in § IV.B, *supra*.

result undermines plaintiffs' assertion that Love Bronze, as manufactured and used, contained "known or reasonably knowable allergenic ingredients" sufficient to establish a defect in product design or formulation. [Dkt. 165 at 17].

Plaintiffs next reference medical records from the May 12 emergency response and hospital admission documenting the rapid onset of respiratory distress and cardiac arrest consistent with anaphylaxis. [*Id.* at 18]. Those records confirm the timing and severity of the reaction and reflect Mr. Mattox's statement that, on the night of the collapse, he applied an anti-inflammatory cream to Mrs. Mattox's chest and back, after which she became nauseated, vomited, and then developed shortness of breath leading to respiratory arrest. The history in these records thus places the onset of symptoms closer in time to the application of an anti-inflammatory cream than to any earlier use of Love Bronze. The cited records do not identify Love Bronze by name, single out any particular ingredient, or describe a defect in design or manufacture; they simply document the clinical course of an anaphylactic event and the contemporaneous history provided by Mr. Mattox.

The undisputed chronology further weakens plaintiffs' theory that Love Bronze itself was defectively designed or manufactured. Mrs. Mattox purchased Love Bronze on May 9, 2022, and used it in the days leading up to her May 12 hospitalization without experiencing a severe allergic reaction. Plaintiffs' own evidence therefore shows repeated use of Love Bronze without incident, followed by a catastrophic reaction that, according to emergency-room history, began immediately after application of a different product. On this record, tying the reaction

21

to Love Bronze, rather than to the cream or to an idiosyncratic response, would require a jury to disregard the temporal sequence recorded in the medical chart and, instead, rely on speculation.

Plaintiffs also invoke testimony from Cosway department heads to argue that the company did not test Love Bronze or its components for allergenicity, did not conduct CIR or allergen testing (including RIPT and HRIPT), and lacked internal protocols or external consultants to assess sensitization or cross-reactivity risks. [Dkt. 165 at 17-18]. The cited testimony shows only that allergy and RIPT testing were not within the responsibilities or knowledge of particular departments or witnesses: Amanda Lai testified that allergy and RIPT testing were not functions of her Quality Services department [Dkt. 165-5 at 179-80 (178:18-179:6)], and Deanna Simon testified that she did not know whether RIPT testing was done on humans before Love Bronze went to market [Dkt. 165-6 at 28 (27:7-9)]. This testimony does not establish that Cosway never performed such testing or that Love Bronze actually contained an undisclosed allergenic ingredient. More importantly, plaintiffs' response identifies no authority—whether under Oklahoma common law or federal regulation—imposing a duty on Cosway to conduct allergen testing or maintain post-market surveillance. Absent evidence linking the alleged absence of testing or surveillance to a specific defect that rendered Love Bronze unsafe for its intended use, these asserted omissions do not themselves constitute a design or manufacturing defect. *See Kirkland*, 521 P.2d at 1362-65; *O'Banion*, 968 F.2d at 1015-16.

Under Oklahoma law, plaintiffs must prove that a defect existed in the product

22

when it left defendants' hands, that the defect rendered the product unreasonably dangerous, and that the defect caused the injury. *Kirkland*, 521 P.2d at 1363. Circumstantial evidence is permissible, but any inference of defect and causation must be reasonable and grounded in coherent defect theory. *See id.* at 1363-64; *Northrip*, 529 P.2d at 497. The Tenth Circuit, applying Oklahoma law, has likewise emphasized that while circumstantial and expert evidence can suffice, it must support a concrete defect and causation theory rather than a chain of conjecture. *See Wheeler v. HO Sports, Inc.*, 232 F.3d 754, 756-58 (10th Cir. 2000).

Measured against those standards, plaintiffs' evidence does not establish a triable issue on defect or causation. Dr. Orandi's opinion that certain ingredients "may have contained almond/almond oil" does not identify any specific allergenic compound actually present in the bottle Mrs. Mattox used. His causation opinion rests primarily on temporal association[9] and the general allergenic potential of certain ingredient classes, rather than on testing that confirmed the presence and concentration of a particular allergen in the product as sold and applied. [Dkt. 46 at 1246-49]. Under Oklahoma law, such "mere possibility" is insufficient to establish defect or causation. *See Kirkland*, 521 P.2d at 1363; *Alberty v. Goodyear Tire & Rubber Co.*, 1997 OK 53, 945 P.2d 128, 132. The medical records, while consistent with an anaphylactic event, do not themselves establish an injury caused by a defect in Love Bronze. When those records are considered alongside (1) Mrs. Mattox's repeated, uneventful use of Love Bronze in the days before May 12, and (2) the

---

[9] Notably, Dr. Orandi's report does not address Mrs. Mattox's intervening application of an anti-inflammatory cream, which undermines the temporal association on which his opinion relies.

23

emergency-room history tying the onset of symptoms to application of an anti-inflammatory cream, the record does not permit a non-speculative finding that a defect in Love Bronze was the producing cause of her injuries.

Oklahoma law permits plaintiffs to rely on circumstantial evidence and expert opinion, but it requires that the resulting inference of defect and causation be grounded in a concrete theory and remain consistent with undisputed facts. *See* <u>Kirkland</u>, 521 P.2d at 1363-64; <u>Wheeler</u>, 232 F.3d at 756-58. Plaintiffs' showing does not meet that standard. They have not identified a specific design or manufacturing defect that rendered Love Bronze unreasonably dangerous to ordinary consumers, and the timing and circumstances of Mrs. Mattox's reaction more closely align with the application of a different product. Defendants are therefore entitled to judgment as a matter of law on plaintiffs' remaining product-based theories.

### E.    PUNITIVE DAMAGES

Finally, defendants seek summary judgment on plaintiffs' request for punitive damages, arguing there is no competent evidence of reckless disregard or malice and that plaintiffs have not properly alleged the statutory elements under 23 O.S. § 9.1. [Dkt. 53 at 20-21]. Under Oklahoma law, punitive damages are "generally considered to be an element of recovery of the underlying cause of action," and not a separate cause of action. *Rodebush v. Okla. Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241, 1247. Section 9.1 authorizes punitive damages where a jury finds, by clear and convincing evidence, that the defendant has been guilty of reckless disregard for the rights of others or has acted intentionally and with malice. <u>23 O.S. § 9.1</u>. The question

24

whether the evidence is sufficient to submit punitive damages to the jury is a question of law for the trial court in its gatekeeping role. *See Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162, 175; *Estrada v. Port City Props.*, 2011 OK 30, 258 P.3d 495, 502-03.

Plaintiffs' punitive damages claim fails for two independent reasons. First, the Court has concluded that plaintiffs cannot establish a viable negligence or manufacturers' products liability claim. In the absence of an actionably underlying tort, punitive damages are unavailable as a matter of law. *See Rodebush*, 867 P.2d at 1247. Second, even if an underlying tort claim survived, the summary-judgment record would not permit a reasonable jury to find the heightened culpability required by § 9.1. Plaintiffs rely on alleged failures to conduct allergenicity testing, alleged deviation from industry guidance, and alleged FDCA-related reporting deficiencies. [Dkt. 165 at 19-23]. But, as explained above, the record does not establish a product defect, a breach of a recognized duty, or a violation of a specific regulatory standard actionable under Oklahoma negligence law. Nor do *Howard*, *O'Banion*, or *Smith* support the proposition that alleged regulatory violations or deviation from industry-standard practices, without more, constitute clear and convincing evidence of reckless disregard or malice. *See Howard*, 299 P.3d at 471-73; *O'Banion*, 968 F.2d at 1016-17; *Smith*, 669 F.2d at 633.

At most, plaintiffs' evidence shows disagreement with defendants' testing, labeling, and safety-assessment practices. It does not show, by clear and convincing evidence, that defendants knew Love Bronze was defective or unreasonably

25

dangerous and consciously disregarded that risk. Summary judgment is therefore warranted on plaintiffs' request for punitive damages.

## V.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment on defendants' affirmative defenses of assumption of risk and intervening cause. [Dkt. 158]. Under Oklahoma law, assumption of risk and intervening cause are affirmative defenses on which defendants bear the burden of proof at trial. *See Thomas v. Holliday*, 1988 OK 116, 764 P.2d 165, 167-70 (assumption of risk as affirmative defense); *Minor v. Zidell Trust*, 1980 OK 144, 618 P.2d 392, 394-95 (independent, unforeseeable intervening cause as defense to liability). On summary judgment, however, the party seeking to strike an affirmative defense must show either that the defense fails as a matter of law or that there is no genuine dispute of material fact on which a reasonable jury could find in favor of the defendant. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, the Court has already concluded that plaintiffs cannot establish the essential elements of their strict products liability and negligence claims because the summary-judgment record does not support a reasonable inference of a cognizable defect, an unreasonably dangerous condition, or breach of a recognized duty of care, nor does it provide more than speculative evidence of causation. In light of that determination, defendants are entitled to judgment as a matter of law on plaintiffs' underlying tort claims, and the viability of defendants' affirmative defenses is no longer outcome-determinative. *See Rodebush*, 867 P.2d at 1247 (punitive damages

26

and related defenses are incidental to, and dependent upon, a valid underlying cause of action).

Even if the Court were to reach the affirmative defenses on an independent basis, plaintiffs have not met their burden to show that those defenses fail as a matter of law. The undisputed record reflects, among other things, that plaintiffs were aware of Mrs. Mattox's "severe" allergies to certain nuts and to ibuprofen, that she used Love Bronze on multiple occasions before May 12 without experiencing a severe reaction, and that her respiratory symptoms began immediately after application of a chiropractor-prescribed anti-inflammatory cream. Those facts, viewed in the light most favorable to defendants, preclude the Court from holding as a matter of law that no reasonable jury could find some degree of voluntary exposure to known risks or some independent, intervening cause of the injury alleged. *See* *Thomas*, 764 P.2d at 167-71; *Minor*, 618 P.2d at 394-96.

Accordingly, plaintiffs' motion for partial summary judgment on defendants' affirmative defenses of assumption of risk and intervening cause is denied as moot in light of the Court's disposition of their underlying claims and, alternatively, on the merits because genuine disputes of material fact preclude judgment as a matter of law in plaintiffs' favor.

## VI.  JOHN DOE DEFENDANTS

With respect to defendants John Does 1-3, the Court finds *sua sponte* that dismissal is appropriate. The Federal Rules of Civil Procedure do not authorize the continued naming of fictitious or anonymous parties in a lawsuit. *See* *Watson v.*

*Unipress, Inc.*, 733 F.2d 1386, 1387-88 (10th Cir. 1984) (affirming dismissal of "John Doe" defendant); *Coe v. U.S. Dist. Ct. for Dist. of Col.*, 676 F.2d 411, 414-15 (10th Cir. 1982) (same). To the contrary, the Rules require that the parties be identified in the caption:

> Every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in Rule 7(a). In the complaint, the title of the action shall include the names of all the parties …

Fed. R. Civ. P. 10(a). Plaintiffs first filed this action on April 18, 2024, and named John Does 1-3 as defendants. [Dkt. 2-2]. More than two years have now passed, and plaintiffs have neither identified these anonymous parties nor sought leave to amend to substitute actual names. The Court can discern no good reason as to why, with the benefit of discovery and motion practice, plaintiffs have been unable to ascertain the true identities of these defendants.

Moreover, the operative complaint contains no substantive allegations directed specifically at John Does 1-3 and therefore fails to meet the pleading standards under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 560-63 (2007). *See generally* [Dkt. 2-2]. In the absence of any factual content plausibly stating a claim against these defendants, their continued inclusion in the caption is improper. Accordingly, defendants John Does 1-3 must be dismissed from this civil action.

## VII. CONCLUSION

Taken together, the Court's rulings on the cross-motions for summary judgment resolve all claims and defenses in this matter.

Plaintiffs' failure-to-warn and labeling theories under Counts I and IV are

preempted by 21 U.S.C. § 379s because they seek to impose alternative or additional nomenclature and allergen-specific, "may contain," or photosensitizer warnings beyond those required by federal cosmetic-labeling regulations, and plaintiffs have not shown a genuine dispute that defendants failed to comply with 21 C.F.R. § 701.3 in labeling Love Bronze. Plaintiffs' remaining product-based theories under Counts I, II, III, and IV—whether framed as design defect, manufacturing defect, ordinary negligence, negligent training, or negligent supervision—likewise fail because the summary-judgment record neither establishes a cognizable defect in Love Bronze that rendered it unreasonably dangerous to ordinary consumers nor supplies non-speculative evidence that any such defect caused Mrs. Mattox's anaphylactic reaction. In the absence of a viable underlying tort, plaintiffs' request for punitive damages is barred as a matter of law.

The Court does not question the seriousness of Mrs. Mattox's injuries, but Oklahoma law does not presume defect from injury alone. A devastating injury may establish damages. It does not establish defect.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [Dkt. 53] is hereby **GRANTED**.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment [Dkt. 158] is hereby **DENIED**.

IT IS FURTHER ORDERED that defendants John Does 1-3 are hereby **DISMISSED without prejudice**.

IT IS SO ORDERED this 17th day of July, 2026.

_____

JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE